**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF ALABAMA**
**SOUTHERN DIVISION**

| | | |
|---|---|---|
| **AXIS SURPLUS INSURANCE COMPANY,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **CIVIL ACTION 05-0527-WS-C** |
| | ) | |
| **INNISFREE HOTELS, INC.,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**ORDER**

This matter comes before the Court on the following motions: plaintiff's Motion for Partial Summary Judgment (doc. 47) relating to flood coverage and the policy attachment point, plaintiff's Motion for Partial Summary Judgment (doc. 50) relating to calculation of deductible, defendant's Unopposed Motion to Amend Brief (doc. 60), defendant's Motion to Strike Affidavit (doc. 64), defendant's Motion to Allow Submission of Supplemental Declaration (doc. 65), and plaintiff's Motion to Strike Defendant's Estoppel Defense (doc. 77). All of these motions are ripe for disposition at this time.[1]

**I.       Factual and Procedural Background.**

This declaratory judgment action concerning the interpretation of an insurance policy is one of many that has arisen in this and other federal courts in the wake of Hurricane Ivan, which lashed the Gulf Coast of Alabama and Florida with winds of 115 mph and a storm surge of approximately 10 to 13 feet on September 15-16, 2004.

At the time of the storm, defendant Innisfree Hotels, Inc. ("Innisfree") was a named insured on several policies of insurance concerning some 13 real properties (predominantly hotels, but also including several individual condominium units and other commercial

---

[1]       Under the E-Government Act of 2002, this is a written opinion and therefore is available electronically. However, it has been entered only to decide the motion or matter addressed herein and is not intended for official publication or to serve as precedent.

properties) in Gulf Shores, Alabama; Orange Beach, Alabama; Pensacola, Florida; Gulf Breeze, Florida; and Pensacola Beach, Florida.[2]  In particular, Innisfree had purchased three layered property insurance policies as a package, covering the period May 6, 2004 through May 6, 2005. (Townsend Decl. I, ¶ 3.)[3]  One such policy was a primary policy (the "Primary Policy") numbered EAF707059 and issued by plaintiff Axis Surplus Insurance Company ("Axis").  It is undisputed that the Primary Policy provides coverage for Innisfree's 13 properties for windstorm and flood damage, up to the policy limits of $5,000,000.[4]

Behind the Primary Policy were two excess layers of coverage.  The first excess layer was issued by Essex Insurance Company (the "Essex Excess Policy") and bearing policy number ESP1984.  That policy listed an attachment point of $5 million, meaning that its coverage did not come into play until the Primary Policy had paid or agreed to pay $5 million in covered losses. Once triggered, the Essex Excess Policy provided $5 million of excess coverage.  (Doc. 9, at Exh. 2; Innisfree Exh. B, at B1.)  By its terms, the Essex Excess Policy excluded coverage for

---

[2]     The record is silent as to Innisfree's precise relationship with those real properties; however, it appears that Innisfree owned and/or operated each of them.

[3]     At various times, defendant has filed three different declarations from Jeff Townsend, who is Innisfree's Director of Development.  (*See* docs. 59 Exh. 1, 59 Exh. 2, and Exh. 65 Exh. 1.)  To avoid confusion, the Court will refer to the Townsend declarations numerically, with the numbers corresponding to the sequence in which those declarations were submitted.

[4]     The "Schedule of Locations and Limit of Liability" in the Primary Policy enumerates specific valuations for each of the 13 properties, with property-specific building valuations reaching as high as $13 million, plus as much as $2.9 million in contents coverage and $3 million in business interruption coverage.  (Innisfree Exh. A, at A3.)  The aggregate Limit of Liability in the Primary Policy for the insured buildings is $42 million, with other coverages (improvements, contents, signs, business interruption) totaling $16,736,000, for a total valuation of $58,736,000.  (*Id.*)  However, a "Flood Endorsement" to that Primary Policy provides that "the limit of liability shown above shall not exceed the sum of $5,000,000 due to any one flood occurrence for all locations combined nor for all flood losses occurring in any one year period or policy period."  (*Id.* at A7.)  Additionally, the Declarations Page reflects a limit of insurance of $5 million for all coverages provided.  (Doc. 9, at Exh. 1.)  Thus, despite the buildings' insured value of $42 million and the aggregate insured valuations of $58,736,000, the Primary Policy affords coverage only for the first $5 million in windstorm and flood losses from the insured locations.  Losses in excess of $5 million are not recoverable under said Primary Policy, but would be compensable (if at all) under the two excess policy layers.

flood losses, stating: "This policy does not cover loss from Earthquake or Flood regardless of this coverage being provided by the primary."  (Innisfree Exh. B, at B2.)

The second layer of excess coverage, and that of interest in this litigation, was provided by an excess policy issued by defendant Axis (the "Axis Excess Policy") and bearing policy number EAF707060.  This third insurance layer (behind the Primary Policy and the Essex Excess Policy) provided a total limit of liability of $48,736,000.  (Innisfree Exh. C, at C7.)

It is undisputed that several Innisfree properties covered by this insurance arrangement sustained damage in Hurricane Ivan, while all of these policies were in effect.[5]  It is likewise undisputed that Innisfree made claims under these insurance policies and that, to date, Axis has paid the $5 million policy limit on the Primary Policy and Essex has paid the $5 million policy limit on the Essex Excess Policy.[6]  Axis alleges that it has paid or is processing for payment to Innisfree amounts exceeding $8 million on the Axis Excess Policy.  (Doc. 48, ¶ 5.)  But Innisfree disputes that allegation (doc. 58, at 2), and the summary judgment record is devoid of supporting evidence.  For purposes of this Order, the Court cannot rely on unsupported, contested allegations of payouts made to date under the Axis Excess Policy.

Whatever the Axis Excess Policy may have paid, it is evident that Innisfree is claiming additional amounts under that policy, and that a dispute has arisen between the parties concerning whether such amounts are due and payable under the terms of that policy.  Thus, the parties find themselves unable to agree on Axis's obligations to Innisfree under the Axis Excess

---

[5]     The parties submit no evidence quantifying or characterizing that damage. Notwithstanding the paucity of evidence in this regard, the Court considers this fact on summary judgment because it is set forth in Axis's proposed determinations of fact, and because Innisfree has not contested its veracity.  (*See* doc. 48, ¶ 4; doc. 58, at 1.)  The record is silent as to how many of those properties were damaged and whether such damage was caused by wind, flood, or both.  The parties apparently disagree on these points, but do not provide any specifics to frame the record.

[6]     Again, these facts are before the Court only because the parties have effectively stipulated to them, without proffering supporting evidence.  (*See* doc. 48, ¶ 5; doc. 58, at 2.) There is no evidence before the Court and no stipulation by the parties as to whether Axis's payments under the Primary Policy were for wind damage, flood damage, or for some combination of wind and flood damage.  As a result, the Court can make no findings on that issue for summary judgment purposes.

Policy, arising from Hurricane Ivan damage. Axis filed a Complaint for Declaratory Judgment (doc. 1) against Innisfree on September 15, 2005. Count I, captioned "Calculation of Deductibles," seeks a declaration that, *inter alia*, both flood and wind deductibles apply to each property which has sustained damage due to both flood and wind and that "[t]he wind deductible to be applied to each of the damaged properties is 2% of the sum of all of the values insured." (Complaint, ¶¶ 25, 26.) Count II, captioned "Apportionment of Damages," seeks a declaration that "[t]he AXIS Excess Policy does not provide coverage for the peril of flood," and that "[i]f this Court determines there is coverage for the peril of flood, that at least $10,000,000.00 in windstorm damage, after application of the appropriate deductible, must be sustained and satisfied, before the AXIS Excess Policy will provide coverage." (*Id.* at 8.) In its responsive pleading, Innisfree denied that Axis was entitled to any relief on these claims. (*See* doc. 3.)

Plaintiff Axis proceeded to file two Rule 56 Motions, each of which is labeled a "Motion for Partial Summary Judgment." Despite the term "Partial" in their monikers, it is evident that these motions, if granted, may dispose of this litigation in its entirety before trial. Indeed, in a Joint Proposed Pretrial Order (doc. 79) filed on September 26, 2006, the parties acknowledge that nearly all of the issues in this case are exclusively legal, as opposed to factual, in nature, with the exception of defendant's estoppel defense pertaining to delivery of the subject insurance policies, and more specifically whether Axis satisfied its delivery obligations through dealings with Innisfree's agent before Hurricane Ivan.

## II.     The Estoppel Issue and Evidentiary Disputes Concerning Same.

Innisfree takes the position that Axis's Rule 56 motion concerning flood coverage and attachment points must be denied because the subject insurance policies were not delivered to Innisfree within a reasonable time, and were not delivered before Hurricane Ivan damaged the insured properties. (Doc. 57, at 21.) Relying on Alabama case law, Innisfree maintains that Axis is estopped from relying on any policy exclusions from or conditions of coverage under these circumstances. (*Id.*) Innisfree did not raise this estoppel defense in its Answer (doc. 3) or at any other time prior to filing its Brief in Opposition to Plaintiff's Motions for Summary Judgment (doc. 57) on June 21, 2006. Before reaching the parties' substantive arguments concerning interpretation of the subject insurance policies, the Court is called upon to address several preliminary matters pertaining to this estoppel defense. Specifically, Axis's Motion to

-4-

Strike Defendant's Estoppel Defense (doc. 77) must be resolved to assess whether that defense may be considered at all in ruling on the Motions for Partial Summary Judgment. If the estoppel defense is permitted, then two evidentiary motions (defendant's Motion to Strike Affidavit of Renaldo Jenkins and defendant's Motion to Allow Submission of Supplemental Declaration) must be adjudicated to establish which evidence will be considered in ruling on that estoppel defense.

In its Motion to Strike, Axis argues that the estoppel defense articulated in defendant's summary judgment opposition brief must be stricken because Innisfree failed to raise that defense in a pleading as an affirmative defense, pursuant to Rule 8(c) of the Federal Rules of Civil Procedure. It is well established that, as a general rule, a party waives any affirmative defense it might have by failing to assert such defense in its pleadings. *See, e.g., In re Holywell Corp.*, 913 F.2d 873, 881 n.13 (11th Cir. 1990); *Menendez v. Perishable Distributors, Inc.*, 763 F.2d 1374, 1378 (11th Cir. 1985) ("Generally, a litigant's failure to assert an affirmative defense in a responsive pleading results in a waiver of that defense."). But Axis's position overlooks three persuasive counterarguments. First, it is plain that "issues not raised in the pleadings may be treated as if they were properly raised when they are tried by express or implied consent of the parties." *Steger v. General Elec. Co.*, 318 F.3d 1066, 1077 (11th Cir. 2003). This is precisely what happened here. When Innisfree raised the estoppel issue in its summary judgment filing in June 2006, Axis's response was not to ask to have it stricken, but to meet it head-on with responsive evidence and arguments. Axis failed to voice any objection to the propriety and timeliness of defendant's interjection of this affirmative defense until September 26, 2006, some three months after the issue had been raised and well after Axis had impliedly consented to its joinder in these proceedings.

Second, even though Innisfree's responsive pleading did not reference its estoppel defense, the Joint Proposed Pretrial Order (filed on the very day that Axis filed its Motion to Strike Estoppel Defense) prominently featured that defense. (*See* doc. 79, at 6-7.) Under Eleventh Circuit law, "omission of an affirmative defense is not fatal as long as it is included in the pretrial order." *Pulliam v. Tallapoosa County Jail*, 185 F.3d 1182, 1185 (11th Cir. 1999); *see also Hargett v. Valley Federal Sav. Bank*, 60 F.3d 754, 763 (11th Cir. 1995) ("if a party omits the defense of statute of limitations in the answer, the defense is not waived if the litigant includes it

in the pretrial order"). Plaintiff offers no argument why defendant has not adequately cured its failure to present the affirmative defense in its answer by preserving such defense in the pretrial order. Third and finally, extant case law confirms that the touchstone of the Rule 8(c) pleading requirement for affirmative defenses is the prevention of unfair prejudice or surprise to the plaintiff. "When there is no prejudice, the trial court does not err by hearing evidence on the issue." *Grant v. Preferred Research, Inc.*, 885 F.2d 795, 797-98 (11th Cir. 1989) (finding the affirmative defense was properly raised in summary judgment motion, even though not pleaded previously, where plaintiff failed to show any prejudice from lateness of pleading); *see also Mitchell v. Jefferson County Bd. of Educ.*, 936 F.2d 539, 544 (11th Cir. 1991) (finding no abuse of discretion for district court to consider affirmative defense that defendant had failed to plead, where plaintiff could not legitimately claim surprise and prejudice from failure to plead defense affirmatively). Axis has identified no prejudice stemming from the absence of the estoppel defense in Innisfree's responsive pleading; therefore, Rule 8(c) is no impediment to the joinder of that defense in these proceedings.

For all of these reasons, the Court finds that plaintiff's Motion to Strike Defendant's Estoppel Defense (doc. 77) is due to be, and the same hereby is, **denied**. The estoppel defense will be considered in resolving the pending Motions for Partial Summary Judgment.

In an attempt to rebut the estoppel defense on the merits, Axis submitted with its summary judgment reply brief the Affidavit of Renaldo Jenkins. (Doc. 63, at Exh. 1.) The Jenkins Affidavit purports to verify the authenticity of certain attached documents, represents that those documents were generated during the negotiation and binding process for the Innisfree insurance coverage, and avers that each such document was received from or sent to Stuart Smith Southeast, Inc., which was allegedly Innisfree's broker in this matter. In response, Innisfree has submitted a one-paragraph Motion to Strike Affidavit of Renaldo Jenkins (doc. 64), stating in conclusory terms that such affidavit must be stricken because it "is not based on personal knowledge." This is not a fair characterization of the Jenkins Affidavit. The affiant identifies himself as an employee of Axis's underwriting department, expressly vouches for the truth and authenticity of the attached documents, and references his personal knowledge of Stuart Smith Southeast, Inc. A reasonable reading of the Jenkins Affidavit strongly suggests that the facts set forth therein are based on personal knowledge, and certainly appears to comport

with Rule 56(e), Fed.R.Civ.P.  As Innisfree offers only the vaguest of arguments to the contrary, the Jenkins Affidavit is properly considered on summary judgment.  The Motion to Strike Affidavit of Renaldo Jenkins is **denied**.[7]

Lastly, Innisfree has filed a Motion to Allow Submission of Supplemental Declaration (doc. 65) to counter the Jenkins Affidavit.  Specifically, Innisfree offers a third Declaration of Jeff Townsend to assert that Stewart Smith Southeast, Inc. was not acting as Innisfree's broker and that defendant has never dealt with that entity.  Axis opposes Innisfree's request to supplement the record in this fashion, by arguing that the policy documents themselves undermine the proposed Third Townsend Declaration by identifying Stewart Smith Southeast as the policies' producer, and because additional documents in Axis's underwriting file establish that Innisfree and/or its agent dealt directly with Stewart Smith Southeast (the wholesale broker) to procure the policies.[8]  Nearly all of Axis's objections to the Third Townsend Declaration focus on its interpretation, construction and weight, not the propriety of admitting it in the first place.  That Axis disbelieves and would attempt to discredit the Third Townsend Declaration is not a sufficient basis, in and of itself, for exclusion of that declaration from the summary judgment record.  Whatever its import and significance might ultimately be, the Third Townsend

---

[7]     In its opposition to the Motion to Strike, Axis offers to have Jenkins re-execute his Affidavit with the additional declaration that all statements therein are based on personal knowledge.  While such an assertion may be helpful in satisfying Rule 56(e), *see HomeBingo Network, Inc. v. Chayevksy*, 428 F. Supp.2d 1232, 1238-39 (S.D. Ala. 2006) (explaining that explicit averment of personal knowledge is generally sufficient to satisfy the personal knowledge requirement), the undersigned is aware of no authority mandating its inclusion.  Absent any such authority or argument by defendant, the Court declines to imbue that language with talismanic significance, and will not put Axis to the unnecessary burden of re-doing an affidavit to correct a phantom flaw.

[8]     In addition to these objections, Axis complains that the Third Townsend Declaration is barred by the "sham affidavit" rule.  *See McCormick v. City of Fort Lauderdale*, 333 F.3d 1234, 1240 n.7 (11th Cir. 2003) ("Under the law of this Circuit, we may disregard an affidavit submitted solely for the purpose of opposing a motion for summary judgment when that affidavit is directly contradicted by deposition testimony.").  However, that rule applies only when an affidavit submitted on summary judgment directly contradicts prior sworn testimony.  Even accepting Axis's contention that the Third Townsend Declaration is inconsistent with other record evidence, it does not conflict with any prior sworn testimony that Axis has identified.  The "sham affidavit" rule has no application here.

Declaration is properly considered here, and the requested supplementation will be permitted. Innisfree's Motion to Allow Submission of Supplemental Declaration is **granted**, and the Third Townsend Declaration (doc. 65, Exh.1) is properly before the Court at this time.[9]

### III.   Summary Judgment Standard.

Summary judgment should be granted only if "there is no issue as to any material fact and the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The party seeking summary judgment bears "the initial burden to show the district court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial."  *Clark v. Coats & Clark, Inc.,* 929 F.2d 604, 608 (11th Cir. 1991).  Once the moving party has satisfied its responsibility, the burden shifts to the nonmovant to show the existence of a genuine issue of material fact.  *Id.*  "If the nonmoving party fails to make 'a sufficient showing on an essential element of her case with respect to which she has the burden of proof,' the moving party is entitled to summary judgment."  *Id.*  (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986)) (footnote omitted).  "In reviewing whether the nonmoving party has met its burden, the court must stop short of weighing the evidence and making credibility determinations of the truth of the matter.  Instead, the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."  *Tipton v. Bergrohr GMBH-Siegen*, 965 F.2d 994, 999 (11th Cir. 1992) (internal citations and quotations omitted).  "Summary judgment is justified only for those cases devoid of any need for factual determinations."  *Offshore Aviation v. Transcon Lines, Inc.*, 831 F.2d 1013, 1016 (11th Cir. 1987) (citation omitted).

In the insurance context, Alabama law provides that "[t]he issue whether a contract is ambiguous or unambiguous is a question of law for a court to decide. ... If the terms within a contract are plain and unambiguous, the construction of the contract and its legal effect become

---

[9]       As part of its objections to the Third Townsend Declaration, plaintiff requests "that limited discovery be allowed as to this issue to resolve the matter."  (Plaintiff's Opposition (doc. 67), ¶ 6.)  But it is far too late in the day to reopen discovery on a matter that, with reasonable diligence, the parties could have foreseen and addressed during the regular discovery period.  In any event, Magistrate Judge Cassady has entered an Order (doc. 72) denying plaintiff's formal request for a discovery extension on precisely this topic, citing an insufficient showing of due diligence and extraordinary circumstances.  This Court agrees; therefore, there will be no reopening of the discovery period to allow further exploration of this issue.

questions of law for the court." *Nationwide Ins. Co. v. Rhodes*, 870 So.2d 695, 696-97 (Ala. 2003) (citation omitted); *see also B.D.B. v. State Farm Mut. Auto. Ins. Co.*, 814 So.2d 877, 879 (Ala.Civ.App. 2001) ("The interpretation of an insurance contract presents a question of law."). In their Joint Proposed Pretrial Order (doc. 79), the parties agree that all of the insurance policy interpretation issues presented in their summary judgment briefs are legal, rather than factual, in nature. (Pretrial Order, ¶¶ II.A4-5, B4-5, C4-5, D4-5.) Therefore, the parties' dispute relative to the proper interpretation of the subject insurance policies is properly resolved on summary judgment.[10]

## IV.   Legal Analysis.

Plaintiff has filed separate motions for summary judgment relating to each of the two counts of declaratory relief prescribed in the Complaint. The first motion addresses the questions of whether the Axis Excess Policy provides flood insurance coverage and whether flood payments by an underlying insurer counts toward the attachment point for the Axis Excess Policy. The second motion focuses on the proper computation and application of the deductible portion of the Axis Excess Policy to the losses at issue.

### A.   Alabama Principles of Insurance Policy Interpretation.

In evaluating both Motions for Partial Summary Judgment, a review of basic principles of Alabama law concerning insurance policy interpretation is instructive.[11]

Under Alabama law, insurance policies, much like other contracts, "are construed so as to give effect to the intention of the parties, and, to determine this intent, a court must examine more than an isolated sentence or term; it must read each phrase in the context of all other provisions." *Celtic Life Ins. Co. v. McLendon*, 814 So.2d 222, 224 (Ala. 2001); *see also Royal*

---

[10]      The Pretrial Order also denotes that factual disagreements exist concerning Innisfree's estoppel defense. (Pretrial Order, at ¶ II.E1.) The Court will take those factual disputes into account in the summary judgment analysis set forth herein.

[11]      The insured properties lie in both Florida and Alabama, so it is not immediately obvious which state's law applies to interpretation of the policies. Nonetheless, both sides rely predominantly on Alabama authorities in presenting their summary judgment arguments, without any substantial discussion of choice-of-law considerations or whether Alabama or Florida law properly governs this dispute.

*Ins. Co. of America v. Thomas*, 879 So.2d 1144, 1153-54 (Ala. 2003) (same).  Insurance

contracts are "construed as written" and are to be interpreted in such a manner "to give meaning

and effect, if possible, to every word and phrase in the contract."  *Royal*, 879 So.2d at 1154

(citation omitted).  In general, insurers bear the burden of proving applicability of a policy

exclusion.  *Acceptance Ins. Co. v. Brown*, 832 So.2d 1, 12 (Ala. 2001).  Exclusions must be

interpreted as narrowly as possible, so as to provide maximum coverage for the insured, and

must be construed against the insurance company that drafted and issued the policy.  *See*

*Generali US Branch v. The Boyd School, Inc.*, 887 So.2d 212, 216 (Ala. 2004) ("Exceptions to

coverage in a policy of insurance must be interpreted as narrowly as possible in order to provide

maximum coverage of the insured.") (citation omitted); *Porterfield v. Audobon Indem. Co.*, 856

So.2d 789, 806 (Ala. 2002).

　　　　"The language in an insurance policy should be given the same meaning that a person of

ordinary intelligence would reasonably give it."  *Western World Ins. Co. v. City of Tuscumbia*,

612 So.2d 1159, 1161 (Ala. 1992).  Any ambiguities must be construed liberally in favor of the

insured and strictly against the insurer.  *See Tyler v. Insurance Co. of North America, Inc.*, 331

So.2d 641, 644 (Ala.1976); *Twin City Fire Ins. Co. v. Alfa Mut. Ins. Co.*, 817 So.2d 687, 695

(Ala. 2001) ("Ambiguous provisions of an insurance policy will be construed most strongly

against the insurer and in favor of the insured.").  By definition, "an ambiguity arises when more

than one interpretation may fairly be given to a policy provision."  *Twin City*, 817 So.2d at 695.

That said, policy terms "should be given a rational and practical construction," applying the

"common interpretation of the language alleged to be ambiguous."  *American Resources Ins. Co.*

*v. H&H Stephens Const., Inc.*, --- So.2d ----, 2006 WL 749992, *4 (Ala. Mar. 24, 2006); *Rhodes*,

870 So.2d at 697 ("the terms of an insurance policy should be given a rational and practical

construction").  The Alabama Supreme Court has cautioned that "ambiguities are not to be

inserted by strained or twisted reasoning."  *Twin City*, 817 So.2d at 692.  The mere fact that the

parties disagree as to what a policy provision means does not mandate a finding of ambiguity

because "[p]arties' conflicting constructions of otherwise unambiguous policy language do not

necessarily render the disputed language ambiguous."  *Shrader v. Employers Mut. Cas. Co.*, 907

So.2d 1026, 1033 (Ala. 2005) (citation omitted); *see also Pritchett v. State Farm Mut. Auto. Ins.*

*Co.*, 834 So.2d 785, 791 (Ala.Civ.App. 2002) ("An insurance policy is not ambiguous merely

-10-

because the parties have assigned different meanings to its provisions.").[12]  Indeed, "in the absence of statutory provisions to the contrary, insurers have the right to limit their liability by writing policies with narrow coverage," and courts cannot subvert the express provisions of a policy by rewriting them in a manner more favorable to the insured.  *Shrader*, 907 So.2d at 1033 (citation omitted); *see also In re HealthSouth Corp.*, 308 F. Supp.2d 1253, 1269 (N.D. Ala. 2004) (noting that "courts may not rewrite policy language so as to provide coverage that was not intended by the parties").

### B.    *Flood Coverage / Attachment Point Issues.*

#### 1.    *Key Policy Provisions.*

In determining when Axis's obligation to pay insurance proceeds to Innisfree takes effect, the Axis Excess Policy provides coverage only after both of the following have occurred: Innisfree's loss exhausts the "Limit of Liability of the Underlying Insurance Policy(ies)"; and the underlying insurers have paid or admitted liability for the full amount of their loss.  (Innisfree Exh. C at C2-C3.)  Coverage under the Axis Excess Policy "shall always be excess over the maximum monetary limit(s) of the Underlying Insurance."  (*Id.* at C3.)  For purposes of establishing the attachment point of coverage, the policy states: "only losses which, except for the amount thereof, would have been payable under this Policy contribute to the satisfaction, reduction or exhaustion of underlying amounts or deductibles."  (*Id.*)

The Commercial Property Schedule in the Axis Excess Policy recites the "Total Limit of Liability of the Underlying Insurance Policy(ies)" as being "$10,000,000 any one occurrence and annual aggregate as respects Earthquake and Flood"; however, Endorsement 1 to that policy amends that limit to read $5,000,000.  (Innisfree Exh. C, at C7, C11.)  The same Schedule in the policy states, under the heading "Sublimits of Liability," as follows: "<u>Not covered</u> any one occurrence and annual aggregate as respects Flood."  (*Id.* at C7.)  Elsewhere, the policy explains

---

[12]        Innisfree contends that "[i]f there is more than one interpretation, then the interpretation favoring coverage must be adopted."  (Opposition Brief (doc. 57), at 3.)  This is not a correct statement of Alabama law.  Rather, as the above authorities make clear, the existence of competing interpretations advanced by the parties is of no consequence unless the policy language itself is ambiguous.  If Innisfree's policy interpretation differs from Axis's, but is based on a contorted, unreasonable reading of otherwise unambiguous policy language, then Innisfree would be entitled to no presumption in its favor.

that, while the Total Limit of Liability ($48,736,000) reflects plaintiff's maximum liability thereunder, "if a Sublimit of Liability is stated in this Policy, the lesser limit shall apply." (*Id.* at C4.)  Thus, the "Not covered" language set forth in the "Sublimits of Liability" section concerning flood losses is given full effect. Reading these provisions collectively, while the Axis Excess Policy comes into play after the underlying insurers have paid or admitted liability for $5 million in flood losses, that policy states that flood losses are "not covered" under its terms.

> 2.    *Discussion.*
>
> a.    *Are Flood Losses Covered?*

At the outset, Axis requests a declaration that the Axis Excess Policy excludes from coverage all losses due to flood.  The policy language lends strong support to Axis's position, as it reads "<u>Not covered</u> any one occurrence and annual aggregate as respects Flood." (Innisfree Exh. C, at C7.)  It is difficult to imagine how a rational and practical construction of the term "Not covered" could yield a conclusion that flood losses are covered under the Axis Excess Policy.

Faced with this apparently unequivocal policy language, Innisfree labors to construct an intrepretation of the policy to the contrary.  Initially, Innisfree points out that the Axis Excess Policy is a "follow form" policy with respect to the Primary Policy, meaning that except where it specifically provides otherwise, its terms follow those of the primary and preceding carriers. *See HealthSouth*, 308 F. Supp.2d at 1282.[13]  Because the Primary Policy does provide flood coverage, the "follow form" nature of the Axis Excess Policy means that it too covers flood losses unless it expressly states otherwise.  The "Not covered" language in the Axis Excess Policy would appear to constitute just an express exclusion, but Innisfree vigorously contests the point.  According to Innisfree, because the "Not covered" language is found under the heading "Sublimits of liability" on the Commercial Property Schedule, the referenced policy language really means that flood losses <u>are</u> covered under the Axis Excess Policy, but that they are simply

---

[13]    A "follow form" policy for excess coverage incorporates by reference the terms of the underlying policy, except insofar as the excess contract by its own terms defines coverage differently. *See id.*

not collectible to the extent that they exceed the sublimit amount.[14]  This is because a "sublimit of liability" is not an exclusion from coverage, but rather is a cap or limit on the amount of coverage.  Thus, Innisfree's view is that the Axis Excess Policy does provide flood coverage, but that the "sublimit" provision simply caps coverage for flood losses at $0.[15]  Because the Axis Excess Policy frames the flood provision as a "sublimit" rather than an "exclusion," Innisfree maintains, coverage does exist for flood losses, albeit with a null sublimit guaranteeing that no flood losses would ever be paid.

In the undersigned's view, defendant's proposed construction of the policy represents just the kind of strained and twisted reasoning that Alabama courts have uniformly rejected.  The Axis Excess Policy states unequivocally that flood losses are "Not covered."  Any rational and practical reading of the policy in its entirety would necessarily reach the conclusion that flood losses are not covered and are not payable, and the policy language is unambiguous on this point.  While Innisfree would apparently prefer that this disclaimer of coverage be stated under the heading of "Exclusions" rather than "Sublimits of liability," the Court is aware of no Alabama authority prescribing any particular "magic words" for exclusion of a particular type of coverage.[16]  A plain, common-sense reading of the Axis Excess Policy confirms that flood losses

---

[14]   Innisfree specifically acknowledges that it "does not suggest that the Axis excess policy pay for flood."  (Opposition Brief, at 12.)  Although this may seem like a curious admission, the real issue here is not whether the Axis Excess Policy must pay for flood losses, but rather whether flood losses paid by the underlying layers of insurance are credited towards the attachment point for coverage by the Axis Excess Policy.  Innisfree wants the Axis Excess Policy to provide coverage for losses above and beyond those paid by the Primary Policy and Essex Excess Policy; however, it will do so only to the extent that losses which would otherwise be payable by the Axis Excess Policy have been paid by the underlying policies to the level of the minimum threshold, or attachment point, specified in the Axis Excess Policy.  If flood losses are otherwise payable under the Axis Excess Policy, they count towards that attachment point.  If not, they do not.  Those considerations lie at the heart of this portion of the dispute.

[15]   Innisfree reasons that the purpose of this policy structure must have been to make certain that flood losses paid by the underlying insurers would "count" toward eroding the limits on the underlying policies for purposes of reaching the attachment point for coverage under the Axis Excess Policy.

[16]   Indeed, this appears to be Innisfree's argument.  Defendant emphasizes that the Essex Excess Policy (which has no discernable bearing on interpretation of the Axis Excess

-13-

are not covered.

    b.  *What is the Attachment Point and What Payments in the Underlying Policies Count Towards It?*

   Next, Axis seeks a declaration that the Axis Excess Policy does not extend coverage to Innisfree unless and until the underlying insurers have paid at least $10 million in non-flood damages for perils covered in the Axis Excess Policy. Stated differently, Axis is asking the Court to find that (1) the attachment point for this policy is $10 million in liability by the underlying insurance policies (*e.g.*, the Primary Policy and the Essex Excess Policy), and (2) any payments by those underlying carriers for flood damages do not count towards that threshold. Innisfree contests both aspects of Axis's policy interpretation.

   The Axis Excess Policy provides that "[o]nly losses which, except for the amount thereof, would have been payable under this Policy contribute to the satisfaction, reduction or exhaustion of underlying limits or deductibles." (Innisfree Exh. C, at C3.) A plain reading of that language is that, if a certain category of loss is not subject to payment under the Axis Excess Policy, then losses within that category (even if paid by underlying insurers) do not count towards the threshold that must be satisfied before coverage is triggered under the Axis Excess

_____

Policy) used an "exclusion" for flood, that the Axis Excess Policy used an "exclusion" for pollutants, contaminants, mold and fungus, but that "[t]here is no wording of 'exclusion' dealing with flood in the Axis excess policy." (Opposition Brief, at 16.) But defendant proffers no argument or authority for why Axis must use any certain terminology to disclaim coverage for flood losses, for why the Axis policy must disclaim flood losses in the same manner as the Essex policy, or for why the Axis policy must use identical verbiage with respect to each category of peril for which it does not provide coverage. All of these arguments are rejected. Likewise, the Court finds unpersuasive Innisfree's reliance on paragraph 6B of the Axis Excess Policy, which provides that underlying insurance coverage must be maintained in full force and effect, "except for any reduction or exhaustion of any underlying aggregate Limit of Liability for Flood and Earthquake ***if covered under this policy***, solely by the amount of loss(es) paid or admitted during the Policy Period." (Innisfree Exh. C, at C3 (emphasis added).) As the highlighted text indicates, such language cannot reasonably be read as establishing the existence of flood coverage under the Axis Excess Policy. It certainly does not "make it clear that flood is covered," as defendant argues. (Opposition Brief, at 18.) Similarly unavailing is defendant's contention that because the Axis Excess Policy states that the excess policy cannot provide coverage broader than the Primary Policy, and because the Axis Excess Policy reflects that the Primary Policy has flood coverage, "[a]ccordingly, there is coverage for flood under the excess policy." (*Id.*) Such *reductio ad absurdum* reasoning cannot advance defendant's cause.

Policy.  Plaintiff's argument on this point is straightforward:  Flood losses are not covered under the Axis Excess Policy, so any flood payments made under the Primary Policy or the Essex Excess Policy cannot erode the attachment point at which the Axis Excess Policy becomes obligated to provide coverage because such flood losses are not otherwise "payable under this Policy."

In response, Innisfree first contends that "any loss for flood would have been payable except for the amount thereof" (Opposition Brief, at 14) under the Axis Excess Policy, because flood is a covered peril subject to a sublimit.  According to defendant, that sublimit means that "the amount thereof" is the only reason why a flood loss would not be payable under that policy.  But the Court has already found that the Axis Excess Policy unambiguously provides that flood losses are not covered.  Even if Innisfree were correct that flood losses are covered subject to a sublimit, the sublimit provision negates all circumstances under which any flood loss, regardless of its amount, would ever be "payable under this Policy" so as to count towards the attachment point.[17]  Innisfree's attempt to argue that the Axis Excess Policy can be reasonably read as allowing flood losses to erode the threshold for coverage must fail.

Innisfree next argues that, even if flood losses are excluded, the attachment provision of the Axis Excess Policy is triggered after $5,000,000 in wind losses, not $10,000,000 as argued by Axis.[18]  The issue is thus whether, under the terms of the Axis Excess Policy, coverage takes

---

[17]     Innisfree's argument to the contrary centers on the policy language "except for the amount thereof."  Defendant reasons that if flood is a covered peril, the only reason why it is not paid under the Axis Excess Policy is because the amount of the flood loss (whatever it might be) exceeds the sublimit of $0.  Therefore, under defendant's reading, it is only the unfortunate fact that the amount of a flood loss is a positive number that prevents it from being payable under the Axis Excess Policy.  This tortured reading of the policy cannot create ambiguity.  Even if flood were a covered peril (which the Court has already found that it is not), the policy language provides categorically that no flood loss (regardless of its amount) can ever be payable under the Axis Excess Policy.  Thus, it is not the "amount thereof" that prevents flood losses from being payable under the Axis Excess Policy, but it is rather the fact that they are in the nature of flood losses.  Defendant's contentions on this front are not compelling.

[18]     Innisfree's theory here is that there evidently have already been more than $5 million, but less than $10 million, in covered wind losses paid by the underlying insurance.  Assuming that to be true, if the attachment point for the Axis Excess Policy is $5 million, then the attachment point has been satisfied and is no obstacle to payment of all remaining wind loss

-15-

hold after $5 million in covered losses have been incurred under the underlying policies, or whether the applicable threshold is $10 million. Multiple provisions in the Axis Excess Policy unambiguously point to the higher figure. First, the Axis Excess Policy clearly states that Axis is liable under that policy only after "[t]he Company(ies) providing Underlying Insurance has paid or has admitted liability for the full amount of their respective loss, damage, and expense." (Innisfree Exh. C at C3.)[19] It is undisputed that the Primary Policy provides $5 million in coverage for wind and flood losses, and that the Essex Excess Policy provides $5 million in coverage for wind losses excess to the Primary Policy. Thus, the only reasonable reading of the above-quoted policy language is that Axis's exposure under its excess policy comes into play only after the $5 million policy limits have been paid under each of the Primary Policy and the Essex Excess Policy.

Second, this construction is reinforced by Axis Excess Policy language providing that "[t]he Underlying Insurance Policy(ies) is the first policy(ies) of property insurance to respond to a claim in the event of loss or damage covered under this Policy." (*Id.* at C4.) Hence, the Axis Excess Policy attaches only after both underlying policies have responded, and each such policy has a $5 million limit, so the Axis Excess Policy's coverage is activated only after $10 million has been paid for those earlier layers of coverage. Third, the Axis Excess Policy drives the point home further by emphasizing: "Notwithstanding any of the terms of this Policy, which might be construed otherwise, ***the insurance provided by this Policy shall always be excess over the maximum monetary limit(s) of the Underlying Insurance***." (*Id.* at C3 (emphasis added).) With

---

by the Axis Excess Policy. But if the attachment point is $10 million, then there may be a hole in defendant's insurance coverage for which Axis is not responsible.

[19] Any suggestion that either the Primary Policy or the Essex Excess Policy does not qualify as "Underlying Insurance" for purposes of this provision is frivolous. "Underlying Insurance" is defined in the Axis Excess Policy to "consist[] of the Lead Insurance Policy and any other policy(ies) that affords coverage for the insured for the Covered Property and is written for limits for which this Policy is excess, whether or not specifically listed in Item 4 of the Commercial Property Schedule." (Innisfree Exh. C, at C4.) Thus, even though Item 4 of the Commercial Property Schedule mentions only the Primary Policy, this expansive definition leaves no doubt that both the Primary Policy and the Essex Excess Policy are considered "Underlying Insurance" for purposes of the Axis Excess Policy.

the maximum monetary limits of the Primary Policy and the Essex Excess Policy being $5 million each, this provision necessarily implies that the Axis Excess Policy does not apply until such maximums have been met for both policies.  Fourth, the Commercial Property Schedule in the Axis Excess Policy identifies the Total Limit of Liability under such policy as being $48,736,000.  (*Id.* at C7.)  Given that the total insured value of Innisfree's portfolio of properties covered by these insurance policies is $58,736,000 (*see* Innisfree Exh. A at A2-A3), it is quite plain that the Axis Excess Policy provides no coverage for the first $10 million in losses, which must be paid by other insurance.

Against this phalanx of policy provisions pointing unequivocally to a $10 million attachment point, Innisfree nevertheless insists that the relevant threshold is just $5 million.  In support of this position, defendant relies on Paragraph 4 of the Commercial Property Schedule in the Axis Excess Policy.  That paragraph delineates the "Total Limit of Liability of the Underlying Insurance Policy(ies)" to be $10 million for "any one occurrence and annual aggregate as respects Earthquake and Flood."  (Innisfree Exh. C, at C7.)  That provision was amended by Endorsement 1 to revise the $10 million figure to a $5 million amount.  (*Id.* at C11.) Reading these two clauses together, defendant maintains that the attachment point for wind damage is just $5 million, stating that "the policy specifically provides that coverage for wind damage attaches after $5,000,000.00 of underlying losses."  (Opposition Brief, at 19-20, 25.)  It does no such thing.  Defendant's proffered interpretation is misleading and results from a selective reading of both the subject provisions and the Axis Excess Policy as a whole.  As amended by Endorsement 1, Paragraph 4 of the Commercial Property Schedule does indeed provide a $5 million attachment point, but only "***as respects Earthquake and Flood***."[20]  That

_____

[20]      The reason for having a $5 million coverage threshold for flood losses but a $10 million coverage threshold for wind losses is readily ascertainable.  As discussed *supra*, the Primary Policy provided up to $5 million in coverage for flood losses, but the Essex Excess Policy excluded flood losses.  Therefore, <u>if</u> flood losses were covered by the Axis Excess Policy, then it would make sense that the attachment point for such coverage would be $5 million in flood losses (not $10 million), because the underlying layers of coverage combined to provide only $5 million in flood coverage.  Had the Axis Excess Policy provided flood coverage, and had the attachment point been left at $10 million for flood losses, then there would have been a coverage gap for flood losses between $5 and $10 million.  Of course, this entire line of inquiry becomes academic given the Axis Excess Policy's non-coverage of flood losses, making

section says nothing about the attachment point for wind damage, which is fixed at $10 million by the plethora of other provisions identified *supra*. Yet Innisfree would have this Court ignore the obvious modifier to Paragraph 4, effectively extirpating it from the policy, and pay no attention to the context of the Policy, disregarding the host of other provisions that dictate the opposite result.[21] Alabama law neither countenances nor permits such a wholesale judicial makeover of the parties' agreed-upon policy of insurance. Therefore, defendant's argument cannot prevail, as the unambiguous terms of the Axis Excess Policy fix the attachment point for wind losses at $10 million.[22]

### c. *Estoppel Defense.*

Innisfree next argues that even if the Axis Excess Policy does not cover flood losses, and even if flood payments by underlying insurers do not count towards the attachment point, and even if the Axis Excess Policy has an attachment point of $10 million for wind losses (all of which this Court has found, as a matter of law), principles of estoppel preclude Axis from receiving declaratory judgment on these grounds. Under Alabama law, subject to premium payment requirements "every policy shall be mailed or delivered to the insured or to the person

---

Innisfree's reliance on Paragraph 4 of the Commercial Policy Schedule even more inscrutable.

[21] Indeed, a common-sense reading of the policy package as a whole underscores the fundamental flaw in Innisfree's logic. The policy package is clearly structured such that the Primary Policy affords coverage to the first $5 million in losses (whether for flood or wind), the Essex Excess Policy affords coverage to the next $5 million in wind losses, and the Axis Excess Policy affords coverage to the next $48,736,000 in wind losses, up to the full insured valuations of Innisfree's covered properties. If the attachment point for wind damage under the Axis Excess Policy were just $5 million, then confusion might ensue if the Primary Policy paid the first $5 million in wind damage, at which time the attachment point for both the Axis Excess Policy and the Essex Excess Policy would be reached, simultaneously. Thus, in addition to disregarding the express terms of the Axis Excess Policy, the result of this interpretation would be to create dueling layers with overlapping coverages.

[22] Of course, in addition to setting the attachment point at $10 million for wind losses, the Axis Excess Policy further states that amounts paid by underlying insurance for losses that would not have been payable under the Axis Excess Policy do not count towards the $10 million. As a result, any amounts that the Primary Policy paid for flood losses do not erode the $10 million threshold, creating a possibility of a gap in coverage between layers for which Innisfree itself would be responsible.

entitled thereto within a reasonable period of time after its issuance."  Ala. Code § 27-14-19(a).
Alabama courts have stringently enforced this requirement, and have imposed harsh penalties on
insurers who fail to comply.  In fact, the Alabama Supreme Court has held that "when an insurer
fails to deliver a copy of the policy to an insured in accordance with Ala. Code 1975, § 27-14-19,
*the insurer may be estopped from asserting an otherwise valid exclusion.*"  *Brown Machine
Works & Supply Co. v. Insurance Co. of North America*, 659 So.2d 51, 60 (Ala. 1995) (emphasis
added).  But the *Brown Machine Works* holding has an important caveat, authorizing estoppel of
exclusions for violations of § 27-14-19 only if the violation "has prejudiced the insured."  *Id.* at
58; *see also Southern Foodservice Management, Inc. v. American Fidelity Assur. Co.*, 850 So.2d
316, 320 (Ala. 2002) (citing *Brown* for this proposition).[23]

Innisfree presents substantial evidence that both (a) Axis failed to deliver a copy of the
Axis Excess Policy to it within a reasonable time after issuance, and (b) Innisfree was prejudiced
thereby.  In particular, Innisfree official Jeff Townsend avers in a declaration that "[t]he 2004-
2005 policies were not delivered to [defendant] until after the losses which occurred as a result
of Hurricane Ivan in September of 2004."  (Townsend Decl. I, at ¶ 4.)  Yet the 2004-2005
policies covered the period of May 6, 2004 through May 6, 2005, such that they were apparently
not delivered until more than four months after their date of issuance.  Townsend further avers
that, prior to Hurricane Ivan, Innisfree was never advised that the Axis Excess Policy would not
afford "credit" for attachment purposes for all losses covered under the Primary Policy.  (*Id.*, ¶
6.)  Moreover, review of the third-layer excess policy that Innisfree held for the previous policy
year (*e.g.*, from May 2003 through May 2004) reflects that such policy provided coverage for
flood losses, up to a total amount of $32,766,400.  (Townsend Decl. I, at Exh. 1.)  If, in fact,
Innisfree was never informed before Hurricane Ivan that flood losses paid by the Primary Policy
would not erode the attachment point for the Axis Excess Policy, and if Innisfree's prior year
third-layer excess policy did provide flood coverage, this combination of facts raises at least an

---

[23]    This limitation is reinforced by the holding of *Brown Machine Works*, wherein
the court explained as follows: "We hold that § 27-14-19 requires that the insurance policy be
'mailed or delivered' to the purchaser of a policy and to the named insured, and that an insurer
may be estopped from asserting conditions of, or exclusions from, coverage where such a
purchaser or insured is prejudiced by the insurer's failure to comply with the statute."  *Id.* at 61.

-19-

inference that Innisfree was prejudiced by the non-delivery of the 2004-2005 policies, which contained a coverage gap before the attachment point that defendant did not even know existed, based on limitations that Axis now seeks to enforce against it to diminish coverage.

In opposition to this affirmative defense, Axis does not suggest that the Axis Excess Policy was ever, in fact, delivered to Innisfree before Hurricane Ivan.  Nonetheless, plaintiff offers evidence, via the Affidavit of Renaldo Jenkins, that Axis delivered a binder for the Axis Excess Policy to Innisfree's broker, Stewart Smith Southeast, Inc., on May 5, 2004, and that such binder clearly delineated that flood coverage would be excluded.  (Jenkins Aff., at Exh. B.)[24]  Axis also shows that, upon reviewing the Axis Excess Policy on September 21, 2004 (four and a half months after the effective date of coverage, and nearly a week after Hurricane Ivan), Stewart Smith Southeast located no discrepancies in coverage between the final policy and the terms negotiated by the parties in or before May 2004.  (Jenkins Aff., at Exh. C.)  Accordingly, Axis's contention is that the estoppel defense is meritless because a binder was timely delivered to Innisfee's broker, so as to satisfy Ala. Code § 27-14-19, and that Innisfree cannot show prejudice in any event because the policy terms were as negotiated between Axis and Innisfree's broker in May 2004, such that the actual policy document contained no unfair surprises to Innisfree.

Plaintiff's line of argument is predicated on the notion that Stewart Smith Southeast is Innisfree's broker, such that notice and delivery to Stewart Smith Southeast were the functional equivalent of notice and delivery to Innisfree.  But Innisfree offers a supplemental declaration from Jeff Townsend that "Stewart Smith Southeast, Inc. was not acting pursuant to the instructions of Innisfree, as the broker in this matter.  Stewart Smith Southeast, Inc. was not the agent nor the broker of Innisfree.  Innisfree has never authorized Stewart Smith Southeast, Inc. to act on its behalf nor has Innisfree ever dealt with Stewart Smith Southeast, Inc." (Townsend

---

[24]     The binder document submitted by Axis says nothing about flood losses paid under the Primary Policy not eroding the attachment point for the Axis Excess Policy. Nonetheless, plaintiff would apparently argue that the Axis Excess Policy accurately reflected the negotiations between Axis and Stewart Smith Southeast in May 2004, such that, by virtue of such negotiations, Innisfree was on notice of the attachment point provision. There is no evidence, however, that the Innisfree/Stewart Smith Southeast negotiations ever touched on the attachment point issue.

Decl. III, at ¶ 4.)  According to Townsend, "Innisfree's broker was Willis-Corroon in Montgomery, Alabama."  (*Id.*, ¶ 5.)  Townsend further declares that "Innisfree never received the 'binders' attached to the affidavit of Renaldo Jenkins."  (*Id.*, ¶ 6.)[25]

Notwithstanding plaintiff's evidence and arguments, the law is clear that the non-movant's evidence must be credited on summary judgment and all reasonable inferences must be drawn in its favor.  Considering this sequence of sworn statements in the light most favorable to Innisfree, the reasonable inferences are as follows: (a) at the time of Hurricane Ivan, Innisfree had received neither policies nor binders from Axis for insurance policies that had gone into effect four months earlier; (b) at the time of Hurricane Ivan, Innisfree did not know that the Axis Excess Policy did not allow payments under the Primary Policy for flood losses to erode the attachment point for that Axis Excess Policy; and (c) whatever Stewart Smith Southeast may have known or done is irrelevant because Innisfree had no dealings with that entity, and that entity was not acting on Innisfree's behalf in any negotiations or communications with Axis. These facts, if proven at trial, would establish a violation of § 27-14-19, would show prejudice to Innisfree, would trigger the estoppel doctrine of *Brown Machine Works*, and might preclude Axis from relying on the flood exclusion or from disqualifying Primary Policy payments for flood loss in computing the attachment point under the Axis Excess Policy.

In light of the foregoing, it is apparent that the relationship between Innisfree and Stewart

---

[25]     Axis offers substantial evidence and argument to undermine the Third Townsend Declaration.  For instance, Axis points out that the policies themselves identify Stewart Smith Southeast, Inc. as the policies' producer, suggesting that that entity was defendant's broker.  (*See* doc. 77, ¶ 2.)  At most, however, this creates a genuine issue of fact as to whether Stewart Smith Southeast was or was not acting on Innisfree's behalf, as this Court cannot credit movant's requested inference from the policy documents over the express averments in nonmovant's evidentiary submission at the Rule 56 stage.  Additionally, Axis speculates that Willis-Corroon (Innisfree's broker) must have approached Stewart Smith Southeast (allegedly a wholesale broker) to request that the latter procure coverage for Innisfree, such that Stewart Smith Southeast really was acting on Innisfree's behalf and agency simply "flowed" from Innisfree through Willis-Corroon to Stewart Smith Southeast.  (*See id.*, ¶ 4.)  But Axis proffers no evidence of such a relationship between Willis-Corroon and Stewart Smith Southeast.  Even if it had done so, such evidence could do more than create a genuine issue of fact, given Townsend's unequivocal averments that Stewart Smith Southeast was not acting on Innisfree's behalf during this transaction.  And Axis's reliance on "settled standards in the industry" suffers from a dearth of record support.  (*Id.*, ¶¶ 4-5.)

Smith Southeast, Inc. (and more specifically, whether an agency relationship existed between them) is unsettled, as a factual matter.  Given the uncertainty as to whether an agency relationship was in place, it cannot be determined whether Stewart Smith Southeast's alleged knowledge and negotiation of the Axis Excess Policy can be imputed to Innisfree for purposes of § 27-14-19 and the *Brown Machine Works* standard.  What Stewart Smith Southeast knew, and whether it was Innisfree's agent, turn on factual matters that this Court cannot address at the Rule 56 stage.  *See, e.g., Wallace v. Frontier Bank, N.A.*, 903 So.2d 792, 801 (Ala. 2004) ("A summary judgment on the issue of agency is generally inappropriate because agency is a question of fact, and agency may not be presumed; the party asserting it has the burden of adducing sufficient evidence to prove its existence."); *Conference America, Inc. v. Telecommunications Co-op Network, Inc.*, 885 So.2d 772, 778 (Ala. 2003) (agency status is "generally a question of fact to be determined by the trier of fact").  The undersigned therefore concludes that issues of material fact remain as to whether the Axis Excess Policy was delivered to Innisfree in a reasonably timely manner pursuant to § 27-14-19, and whether Innisfree suffered prejudice as a result of any such unreasonable delays.  The continuing viability of Innisfree's estoppel defense precludes entry of summary judgment declaring whether the Axis Excess Policy furnished coverage to Innisfree for flood losses, and whether flood losses paid under the Primary Policy would count towards the $10 million coverage threshold.[26]  On that basis, plaintiff's Motion for Partial Summary Judgment on the flood coverage and attachment point issues must be, and is, **denied**.[27]

---

[26]    That said, the undersigned's legal determinations, *supra*, concerning the flood exclusion and the attachment point will take effect if the finder of fact determines at trial that Innisfree is not entitled to the sanctuary of the *Brown Machine Works* estoppel defense.

[27]    In light of the myriad factual questions remaining on the estoppel issue, the Court need not make a legal determination as to whether discussion of policy terms in negotiations or delivery of a binder to an agent is sufficient to satisfy Ala. Code § 27-14-19.  Depending on how the underlying factual issues are resolved, that question may never be reached; therefore, the Court will not render an anticipatory, advisory ruling on this point, particularly where the parties have not fully briefed this question.  If Stewart Smith Southeast is found to be Innisfree's agent, then the parties should be prepared to take up the question of whether Axis's dealings with Stewart Smith Southeast were legally sufficient to satisfy *Brown Machine Works*.

## C.      Calculation of Deductible.

In its second Motion for Partial Summary Judgment, Axis requests entry of a declaratory judgment as to the proper methodology for computing a deductible under the Axis Excess Policy. According to Axis, the deductible for wind losses is the sum of 2% of the insurable values at all insured locations of Innisfree property. Because the total insurable values of Innisfree's portfolio of properties covered by this policy package is $58,736,000, Axis contends that the proper deductible for wind damage under the Axis Excess Policy is 2% of that amount, or $1,174,720. By contrast, Innisfree's position is that the applicable deductible for wind damage is 2% of the value of the damaged building with the highest insurable value. Because the building with the highest valuation is insured at $13 million, Innisfree maintains, the highest wind deductible that can be required is 2% of that amount, or $260,000. Each party contends that the applicable policy language unambiguously supports its position.[28]

### 1.      Key Policy Provisions.

The Axis Excess Policy clearly provides that, with certain exceptions not relevant here, it is "subject to the same limitations, terms and, conditions ... as are contained in or as may be added to the Lead Insurance Policy prior to the happening of a loss for which a claim is made." (Innisfree Exh. C, at C2.) The "Lead Insurance Policy" is defined as the Primary Policy. (*Id.* at C7.) For that reason, the parties agree, any analysis of deductibles that must be paid antecedent to insurer payout under the Axis Excess Policy is governed by the terms of the Primary Policy.

Several provisions of the Primary Policy bear on the proper method for computation of a deductible. First, a "Multiple Deductible Form" states that the "Deductibles applicable to any one occurrence" equate to "2% of values at each building ... subject to $100,000 minimum per

---

[28]      Two preliminary issues must be addressed. First, the Court notes that the parties also disagree as to the applicable deductible for flood losses under the Axis Excess Policy. Because the Court has already ruled that the Axis Excess Policy unambiguously affords no coverage for flood losses, the parties' debate over what the applicable total deductible would have been had that policy extended coverage to flood losses is **moot** and need not be entertained. Second, Innisfree has filed an Unopposed Motion to Amend Brief in Opposition to Plaintiff's Motions for Summary Judgment (doc. 60) to include one additional sentence concerning the total flood deductible for the Axis Excess Policy. Although the flood deductible issue is moot, given the policy's lack of flood coverage, the Court **grants** the Unopposed Motion (doc. 60) and will deem defendant's Opposition Brief (doc. 57) **amended** as requested.

occurrence, as respects wind and hail." (Innisfree Exh. A, at A4.)[29]  A section of the Primary

Policy labeled "Deductible" explains that "When the occurrence involves loss to more than one

item of Covered Property and separate Limits of Insurance apply, the losses will not be

combined in determining application of the Deductible.  But the Deductible will be applied only

once per occurrence." (*Id.* at A5.)[30]  This language is supplemented by the "Multiple Deductible

Form," one portion of which provides as follows:

> "The following is added to the DEDUCTIBLE section:

> "A.    In the event that loss or damage occurs to Covered Property at more than one
> building location as a result of one occurrence, the largest applicable deductible
> for that Covered Cause of Loss, shown in the Schedule above or in the
> Declarations, will apply.

> "B.    The terms of this endorsement do not apply to any Windstorm or Hail Percentage
> Deductible provided elsewhere in this policy."

(*Id.* at A4.)  The interpretation of these provisions is central to determining the proper

computation and application of the deductible for the Axis Excess Policy.

> 2.     *Discussion.*

The parties appear to be in agreement that a 2% deductible applies to Innisfree's claims

---

[29]     The Multiple Deductible Form clearly contemplates the preparation of a Schedule
for purposes of delineating applicable deductibles.  This Schedule would list Premises and
Building Number, then in a separate column list the deductible attaching to that specific building
by covered cause of loss.  (*Id.*)  Such a Schedule is necessary because the percentage-based
deductibles will clearly be different from one building to the next because of the different
valuations at each building, such that the fixed-percentage deductibles calculated from said
valuations will necessarily vary from one building to the next.  Evidently, this Schedule, while
referenced and outlined in the Multiple Deductible Form, was never prepared as part of the
Primary Policy.  Nonetheless, that provision reflects the parties' contemplated arrangement as to
building-by-building deductibles.

[30]     The Primary Policy offers a numerical example to highlight this principle.  The
stated hypothetical involves a scenario in which the deductible is $250, a Building 1 has
sustained a $60,100 loss and a Building 2 has sustained a $90,000 loss, while the coverage limit
on Building 1 is $60,000 and the coverage limit on Building 2 is $80,000.  In that event, the
$250 deductible is applied only to the loss from Building 1 in determining the amounts payable,
and is not subtracted from the amount of loss for Building 2.  In explaining this result, the
Primary Policy indicates: "The Deductible applies once per occurrence and therefore is not
subtracted in determining the amount of loss payable for Bldg. 2." (*Id.* at A5.)

for wind losses under the Axis Excess Policy.  The question is: 2% of what?  Axis argues that the proper deductible computation method for wind damage at multiple insured properties is spelled out clearly by the Multiple Deductible Form's statement that the deductible is "2% of values at each building ... as respects wind and hail."  (*Id.*)  Based solely on this language (without any discussion of the other deductible-related language in the Primary Policy), plaintiff states that this "2% of values at each building" necessitates that the proper deductible here is the aggregate of 2% of the insured values of all of Innisfree's properties covered by that policy, or $1,174,720 (2% times the $58,736,000 total insured value of Innisfree's properties).[31]  Simply put, plaintiff's position is that "[t]he Deductible provision of the Axis Primary policy clearly refers to a single deductible which is the sum of all values insured under the policy."  (Doc. 52, at 13.)[32]

By contrast, defendant asserts that the deductible must be computed by reference to the "Deductible" section of the policy, including the addendum in the "Multiple Deductible Form,"

----

[31]        Two obvious questions arise.  First, it is unclear why Axis would compute the 2% deductible based on valuations of all properties, whether those properties were damaged or not.  Second, it is unclear why Axis did not calculate the 2% deductible based on the insured building values (which total $42,000,000), but instead utilized total insured values of those properties, which include insurance for contents, business interruption, improvements, and signs, as well as for the building value.  The distinction matters.  Using a building value computation method, the applicable deductible would have been $840,000 (2% times $42,000,000 in building values).  By comparison, Axis arrives at a deductible amount of $1.174 million by factoring in all insured values, not just building values, without ever explaining why.  Meanwhile, Innisfree makes its deductible calculations by reference exclusively to building values, rather than other components of total insured valuations.  Aside from a fleeting, conclusory reference in defendant's brief (doc. 57, at 7), neither side explores or explains whether building insured values or total insured values (including contents, business interruption, etc.) is the proper multiplier for purposes of deductible computation.  Because this issue has not been briefed adequately or presented properly on summary judgment, the Court will not decide it *sua sponte*.

[32]        Axis's position is that the $1,174,720 deductible for wind damage applies regardless of whether one property has been damaged by wind, or whether all 13 properties have been damaged by wind.  It seems incongruous, at best, that a wind loss at, for example, the $200,000 Baybridge Building Ltd. Co. building, resulting in total destruction of that building and no other insured properties would result in no payment under Axis's reading of the policy because the 2% valuations of the 12 undamaged properties would weigh into the deductible calculus, such that the $1 million-plus deductible would dwarf the $200,000 amount of loss.  The Court has located no policy language that would mandate such a result.

-25-

rather than simply examining the "2% of values at each building" language in a vacuum. Innisfree correctly points out that the Primary Policy expressly provides that "the Deductible will be applied only once per occurrence." (Innisfree Exh. A, at A5.)  This language confirms that only one deductible can be applied for Hurricane Ivan, but says nothing about the source of that deductible.  To confront this issue, Innisfree relies on the addendum to the "Deductible" section, which provides that if a single occurrence causes losses at multiple covered properties, "the largest applicable deductible for that Covered Cause of Loss, shown in the Schedule above or in the Declarations, will apply." (*Id.* at A4.)  Innisfree reasons that, because of the property-specific deductibles for wind damage, this provision is necessary to prevent confusion as to which deductible applies if multiple properties are damaged.  According to Innisfree, the "largest applicable deductible" means the largest property-specific deductible for wind damage for any property that has sustained such damage.  Thus, if five covered properties incurred wind loss in a single occurrence, defendant maintains, the applicable deductible would be 2% of the insured value of the wind-damaged property with the highest insured value among those that sustained losses.  Here, the highest-valued covered property that sustained wind losses was the Hilton Garden Inn, with a building insured value of $13 million, so Innisfree contends that the appropriate deductible is 2% of that $13 million figure, or $260,000.[33]

In the Court's view, Axis places undue reliance on the "2% of values at each building" language, which creates a separate deductible amount for each of the 13 covered properties based on their valuations, for purposes of the Schedule contemplated by the Multiple Deductible Form.  In keeping with that "2% of values at each building," the policy contemplates a Schedule

---

[33]     In reply, Axis again points to the "2% of values at each building" language and argues that interpreting the deductible provisions as Innisfree proposes would contravene *General Star Indem. Co. v. West Florida Village Inn, Inc.*, 874 So.2d 26 (Fla. 2d DCA 2004), in which an intermediate Florida appellate court opined that deductibles should apply only to covered losses.  (Reply Brief, at 2-4.)  But there is no suggestion here that Innisfree is attempting to force a deductible to apply to non-covered losses, so *General Star* is unhelpful here.  Axis does not explain how *General Star* is relevant to the issues at hand, or how Innisfree's proposed construction would effectively apply a deductible to non-covered losses or otherwise commit Axis to liability for losses not covered by the policy.  Moreover, Axis's briefs barely acknowledge the "Deductible" addendum to the "Multiple Deductible Form," much less explain how it can reasonably be construed in the manner that Axis requests.

listing each of the 13 properties and delineating different wind deductible amounts for each of them based on the 2% provision.[34]  The implication would be that if multiple properties are damaged, then a 2% deductible as to each damaged property would be applied before the policy paid.  But that provision, in and of itself, does not specifically address how the deductible is to be calculated if multiple properties are damaged in a single occurrence.  If other policy provisions do specifically speak to that situation, then those provisions would trump the general "2% of values at each building" phraseology, which marks both the start and the terminus of Axis's policy interpretation.[35]

It is appropriate, then, to consult other policy provisions seeking clarification as to deductible computation for multiple-property losses from a single occurrence.  Defendant does just that by pointing to the Deductible endorsement on the "Multiple Deductible Form," which provides that if more than one building location is damaged "as a result of one occurrence, the largest applicable deductible for that Covered Cause of Loss, shown in the Schedule above or in the Declarations, will apply."  (Innisfree Exh. A, at A4.)  Reading that language in conjunction with the "Deductible" section's admonition that "the Deductible will be applied only once per occurrence" (*Id.* at A5), defendant reasons that the "largest applicable deductible" would be the largest property-specific deductible for any of the wind-damaged properties, as taken from the Schedule, which would then constitute the <u>only</u> deductible that Innisfree would have to pay for that cause of loss.  This is a cogent, reasonable interpretation of the cited policy language, which appears to speak precisely to the losses-at-multiple-covered-properties-from-a-single-occurrence

---

[34]      If Axis were correct that one-size-fits-all deductible of 2% of the total insured values of all properties applied no matter which buildings were damaged, then the policy would not have needed a property-specific Schedule of deductibles.

[35]      Nor does the Court find persuasive plaintiff's citation to Florida case law explaining how Florida courts have interpreted policy language that is dissimilar from the language at issue in this case, and its criticism that Innisfree "does not cite a single case" that supports its reading of the policy.  (Reply Brief, at 3.)  Of course, courts looking to construe insurance policies should look to the policy language itself in the first instance to divine its meaning.  If the meaning of the relevant policy provisions is clear, then there is no reason to look to the case law to see how other courts have construed different policy language in other cases in order to ascertain the proper meaning of the challenged policy language in this case.

scenario that is in play here.

Axis's reply brief (doc. 63) attacks Innisfree's interpretation in four respects, none of which are convincing. First, Axis argues that applying only a 2% deductible to the highest-valued building, with no corresponding deductibles for other damaged buildings, "allows for an inconsistent interpretation of the policy whereby other damaged buildings would be afforded full coverage without application of any deductible." (Reply Brief, at 3.) The Court agrees that one reasonable way to structure a deductible would have been to charge a separate 2% deductible for each damaged property if multiple properties were damaged; however, that is not how Axis chose to write its policy. Defendant's proffered construction is not "inconsistent" at all if it corresponds to the specific provisions that Axis wrote into such policy, and Axis offers no basis for concluding that it does not correspond to the policy language. Second, Axis insists that the phrases "2% of values at each building" and "largest applicable deductible" must be read in conjunction with each other, and that Innisfree's construction would render them mutually exclusive. The Court finds nothing in Innisfree's interpretation that would invalidate one or the other of those phrases. If anything, defendant's position harmonizes and gives meaning to both provisions, whereas plaintiff's view would effectively excise the term "largest applicable deductible" from the policy as so much surplusage.[36]

Third, Axis criticizes Innisfree's interpretation by arguing that it negates the term "values at each building" in the Multiple Deductible Form. (Reply, at 4.) This statement is incorrect.

_____

[36]   Indeed, according to Axis, "the only logical interpretation of this endorsement is ... that the deductible to be applied in the event that one occurrence causes damages to multiple covered properties is for the deductible to be calculated at 2% of the values of each covered and damaged building." (Reply Brief, at 3-4.) That "logical interpretation" conflicts with Axis's position articulated elsewhere in its principal brief that the total insured values of all properties, both damaged and undamaged, are used in the calculation (*see supra*). It also ignores the "largest applicable deductible" clause. Equally unpersuasive is Axis's statement that "[t]o hold otherwise creates an absurd result where Axis is forced to pay the full value of each damaged building less the deductible for only one of the covered and damaged buildings." (*Id.* at 4.) Normative value judgments about what is or is not "absurd" notwithstanding, that is what Axis's insurance policy says. An insurer cannot evade the language of its own insurance policy simply by branding the foreseeable consequences of that language "absurd" in a particular case, and courts will not rewrite an insurance policy for the sake of equity to protect an insurer from an "absurd" result flowing directly from its own policy drafting choices.

The "values at each building" wording refers to the preparation of a Schedule which would delineate property-specific deductibles for each covered cause of loss.  That Schedule, listing each property and its myriad deductibles based on the requisite cause of loss, would then be consulted in computing the relevant deductible after a particular loss.  Thus, the term "values at each building" continues to have meaning and relevance in the context of the policy under the insured's construction of same.  Fourth, plaintiff balks that "values at each building" is a phrase that "clearly contemplates that the values of all damaged and covered buildings be included when determining the applicable deductible."  (*Id.*)  If that were the meaning that Axis intended, then the Deductible addendum concerning the "largest applicable deductible" runs directly counter to Axis's intention for "values at each building," suggesting that Axis included conflicting provisions in its policy.  But canons of construction dictate that courts interpret contracts to harmonize their provisions where possible, rather than to adopt interpretations that construe contradictions as Axis requests here.

It is an insurer's responsibility to select policy language that accurately and clearly reflects its intentions.  If its intent was for wind-loss deductibles in multiple-property occurrences to aggregate 2% of the values of each damaged building, then Axis failed to meet that obligation in crafting the "Multiple Deductible Form" endorsement on the Primary Policy.  Try as it might, Axis cannot erase the Deductible addendum's instructions that in the event of a multiple-property loss, "the largest applicable deductible for that Covered Cause of Loss, shown in the Schedule above or in the Declarations, will apply."[37]  The referenced Schedule includes property-specific deductibles calculated in accordance with the 2% formulation.  The unambiguous meaning of that Deductible addendum is to examine that Schedule, select the "largest applicable deductible for that Covered Cause of Loss" from the list of insured properties, and apply that deductible to the instant claim.  Elsewhere, the Axis policy confirms that "the Deductible will be applied only once per occurrence," the plain meaning of which would preclude Axis from picking multiple property-specific deductible figures for the Covered

---

[37]      Axis cannot identify a single scenario in which the property-specific Schedule identified in the Multiple Deductible Form would ever list a deductible that aggregated 2% values across multiple buildings; rather, Axis would simply strip the "largest applicable deductible" language from the policy.

Cause of Loss from the Schedule and effectively charging the insured multiple deductibles, one for each wind-damaged property.  Because the insured's construction of the challenged policy language is reasonable, and because the insurer has failed to demonstrate that the language unambiguously militates against the construction championed by the insured, the undersigned finds that Axis's Motion for Partial Summary Judgment on the deductible issue is due to be, and the same hereby is, **denied**.[38]

**V.     Conclusion.**

For all of the forgoing reasons, it is hereby **ordered** as follows:

1.     Plaintiff's Motion to Strike Defendant's Estoppel Defense (doc. 77) is **denied**.

2.     Defendant's Motion to Strike Affidavit of Renaldo Jenkins (doc. 64) is **denied**.

3.     Defendant's Motion to Allow Submission of Supplemental Declaration (doc. 65) is **granted**, over plaintiff's objection.

4.     Plaintiff's Motion for Partial Summary Judgment (doc. 47) on the flood coverage and attachment point issues is **denied** because genuine issues of material fact preclude entry of summary judgment on the question of defendant's estoppel affirmative defense.  If the estoppel issue is later resolved in plaintiff's favor, then the undersigned's rulings herein concerning the flood coverage and attachment point issues in the Axis Excess Policy will take effect, and will not be relitigated at trial.

---

[38]     That said, the Court is perplexed at the omission of a particular policy provision from both parties' analyses.  As part and parcel of the Deductible addendum including the "largest applicable deductible" language, the policy states, "The terms of this endorsement do not apply to any Earthquake Deductible or to any Windstorm or Hail Percentage Deductible provided elsewhere in this policy."  (Innisfree Exh. A, at A4.)  In the absence of any briefing or argument by the parties, the Court declines to explore, *sua sponte*, the significance (if any) of this sentence on the above analysis.  This Court will not make the parties' summary judgment arguments for them. *See generally Pinto v. Universidad De Puerto Rico*, 895 F.2d 18, 19 (1st Cir. 1990) ("the court is under no duty to exercise imagination and conjure what a plaintiff might have alleged, but did not, and do counsel's work for him or her"); *Resolution Trust Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir. 1995) ("[t]here is no burden upon the district court to distill every potential argument that could be made based upon the materials before it"); *Bowden ex rel. Bowden v. Wal-Mart Stores, Inc.*, 124 F. Supp.2d 1228, 1236 (M.D. Ala. 2000) ("[i]t is not for the court to manufacture arguments on Plaintiff's behalf").

5.     Defendant's Unopposed Motion to Amend Brief in Opposition to Plaintiff's Motions for Summary Judgment (doc. 60) is **granted**.

6.     Plaintiff's Motion for Partial Summary Judgment (doc. 50) on the deductible issue is **denied**.

7.     In reviewing the court file, the undersigned notes that there remain certain pending counterclaims by Innisfree against Axis.  Although those counterclaims were apparently redressed during an appraisal process, the parties have never formally dismissed them or requested the Court to take any dispositive action concerning same.  The counterclaims are not referenced in any way in Joint Proposed Pretrial Order (doc. 79) filed on September 26, 2006.   Therefore, those counterclaims are deemed abandoned and are hereby **dismissed without prejudice** because they are outside the scope of the triable issues joined in the parties' Joint Proposed Pretrial Order.

8.     This action remains scheduled for a Final Pretrial Conference on **October 10, 2006** at **2:30 p.m.** in the chambers of the undersigned, with trial to follow in the **November 2006** civil term.

DONE and ORDERED this 5th day of October, 2006.

                                        s/ WILLIAM H. STEELE
                                        UNITED STATES DISTRICT JUDGE